1

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
2    seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
3    marie@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)
4    hayley@gutridesafier.com
100 Pine Street, Suite 1250
5 San Francisco, CA 94111
Telephone: (415) 639-9090
6 Facsimile:  (415) 449-6469

7 *Attorneys for Plaintiff*

8               UNITED STATES DISTRICT COURT FOR THE

9                 NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10   CHRIS GUERRA, an individual, on behalf of himself, the general public, and 11   those similarly situated, | CASE NO. |
| 12                      Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT** |
| 13   v. | |
| 14   KIND, LLC, | |
| 15                      Defendant. | |
| 16 | **JURY TRIAL DEMANDED** |

17                      **INTRODUCTION**

18          1.     Plaintiff Chris Guerra, by and through his counsel, brings this class action

19 against Defendant KIND, LLC ("Defendant") to seek redress for its unlawful and deceptive

20 practices in labeling and marketing the KIND brand nut bars, cereals, oatmeal, snack mixes,

21 and other products, which make protein claims on the front of the product packages while

22 omitting a statement of the corrected amount of protein from the Nutrition Facts Panel

23 ("NFP").

24          2.     Consumers are increasingly health conscious and, as a result, many consumers

25 seek foods high in protein. To capitalize on this trend, Defendant prominently labels some of

26 its nut bars, cereals, oatmeal, and other products as providing specific amounts of protein per

27 serving depending on the product, such as "6g PROTEIN" per serving on the front label of its

28 KIND Dark Chocolate Nuts & Sea Salt nut bars. Consumers, in turn, reasonably expect that

each product will actually provide the amount of protein per serving claimed on the front of the product package in a form the body can use.

3.     The Food and Drug Administration ("FDA") prohibits such front label claims about the amount of protein unless manufacturers also provide additional information in the nutrition fact panel about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13(b), (n). That is because the FDA recognizes that (1) when manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving. Some proteins are deficient in one or more of the nine amino acids essential to human protein synthesis and/or are not fully digestible within the human gut. When a human body uses up the least prevalent essential amino acid from a food product, protein synthesis shuts down and all of the remaining amino acids from that protein source degrade mostly into waste. Likewise, whatever portion of a protein source is not digestible is similarly unavailable for protein synthesis. A protein's ability to support human nutritional requirements is known as its "quality."

4.     The FDA required method for measuring protein quality is called the "Protein Digestibility Corrected Amino Acid Score"—known by its acronym PDCAAS (pronounced Pee-Dee-Kass). It combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of .5 means that only half of the protein in that product is actually available to support human protein needs. If the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving. As a result, protein products can vary widely in their ability to support

1   human protein needs—even between two comparator products with the same total protein

2   quantity.

3       5.      Because consumers are generally unaware about the usability of various

4   proteins, and may even be unaware of the total amount of usable protein they should ingest

5   each day, the FDA prohibits manufacturers from advertising or promoting their products with a

6   protein claim unless they have satisfied two requirements. First, the manufacturer must

7   calculate the "corrected amount of protein per serving" based on the quality of the product's

8   protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS

9   computation to provide "a statement of the corrected amount of protein per serving" in the

10  nutrition facts panel ("NFP") "expressed as" a percent daily value ("%DV") and placed

11  immediately adjacent to the statement of protein quantity. 21 C.F.R. § 101.9(c)(7)(i)-(iii). The

12  %DV is the corrected amount of protein per serving divided by the daily reference value for

13  protein of 50 grams. *Id.* Using the same example of a product containing 10 grams total protein

14  per serving with a PDCAAS of .5, the %DV is 10% (5g/50g). Had all of the protein in the

15  product been useful in human nutrition, the %DV would be 20% (10g/50g). The FDA

16  regulations that govern nutrient content claims are also clear that a manufacturer may not make

17  any claims on the front packaging about the amount of protein in the product unless it complies

18  with these two requirements. *See* 21 C.F.R. § 101.13(b) ("A nutrient content claim[] may not

19  be made on the label…unless the claim is made in accordance with this regulation [i.e., §

20  101.13]…" and (n) ("[n]utrition labeling in accordance with § 101.8…shall be provided for

21  any food for which a nutrient content claim is made"); *accord* 58 Fed. Reg. 2302, 23310

22  (manufacturer can only make a "nutrient content claim…on the label or in labeling of a food,

23  provided that the food bears nutrition labeling that complies with the requirements in proposed

24  § 101.9.").

25      6.      The primary protein source in Defendant's products are almonds, peanuts, and

26  oats. The PDCAAS scores for all three fall between approximately .4 and .5, which means

27  Defendant's products will provide nutritionally *less than half* of the protein quantity claimed.

28  Nevertheless, Defendant failed to provide in the NFP a statement of the corrected amount of

protein per serving calculated according to the PDCAAS methodology and expressed as a %DV. Accordingly, the protein claims on the front of the package, such as "6g PROTEIN" are unlawful in violation of parallel state and federal laws because Defendant did not comply with the regulatory requirements for making a protein claim. 21 C.F.R. § 101.9(c)(7)(i), 101.13(b), (n). The failure to include a statement of the corrected amount of protein inside the NFP also rendered the NFP itself unlawful. *Id*. § 101.9(c)(7)(i).

7.      In addition to being unlawful under 21 CFR §§ 101.9 and 101.13, Defendant's prominent protein claims on the front of the package while omitting the statement of the corrected amount of protein per serving expressed as a %DV in the NFP, is also likely to mislead reasonable consumers. Consumers reasonably expect that Defendant's products will actually provide nutritionally the full amount of protein per serving claimed on the front of the package and stated in the protein quantity section of the NFP, i.e., that the products contain high quality proteins. But Defendant's products do not do so and instead contain low quality proteins. Had Defendant included a statement of the corrected amount of protein per serving in the NFP, as it was required to do under the law, it would have revealed that the product contains low quality proteins. That information was material to reasonable consumers.

8.      Defendant's unlawful and misleading labeling caused Plaintiff and members of the class to pay a price premium.

## PARTIES

9.      Plaintiff Chris Guerra is, and at all times alleged in this Class Action Complaint was, an individual and a resident of San Leandro, California. Plaintiff makes his permanent home in California and intends to remain in California.

10.     Defendant KIND, LLC is a limited liability corporation existing under the laws of Delaware, with its principal place of business in New York.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one Class member and Defendant are citizens of different states.

12.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.     In accordance with California Civil Code Section 1780(d), Plaintiff concurrently files herewith a declaration establishing that, at various times throughout the class period, he purchased KIND brand nut bars in the Dark Chocolate Nuts & Sea Salt, and Peanut Butter Dark Chocolate flavors from a Lucky Supermarket retail store in Alameda County, California. (Plaintiff's declaration is attached hereto as Exhibit A.)

15.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

**SUBSTANTIVE ALLEGATIONS**

16.     Defendant manufactures, distributes, markets, advertises, and sells a variety of breakfast and snack products under the brand name "KIND." Many of these products have had packaging during the Class Period that predominately, uniformly, and consistently states on the principal display panel of the product labels that they contain and provide a certain amount of protein per serving. Plaintiff has attached, as Exhibit B, a non-exhaustive list of KIND products that currently or during the Class Period have made protein claims on the front of the product packages but failed to include a statement of the corrected amount of protein inside the NFP. The products listed in Exhibit B, and any other KIND product that claims a specific amount of protein on the front of its label, will hereinafter be referred to as the "Products."

17.     The representations that the Products contain and provide a specific amount of protein per serving were uniformly communicated to Plaintiff and every other person who purchased any of the Products in California. The same or substantially similar product label has

appeared on each Product during the Class Period in the general form of the following example:



18.     The nutrition facts panel on the back of the Products uniformly and consistently failed to provide any statement of the corrected amount of protein per serving, expressed as a %DV, during the Class Period. The nutrition facts panels of the Products have appeared consistently during the Class Period in the general form of the following example (from the KIND brand nut bars in the Dark Chocolate Nuts & Sea Salt flavor):



19.     As described in detail below, Defendant's advertising and labeling of the Products as containing and providing specific amounts of protein per serving is unlawful, misleading, and intended to induce consumers to purchase the Products at a premium price, while ultimately failing to meet consumer expectations. The Products' front label protein claims are unlawful because Defendant did not: (1) calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method; and (2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as a %DV. 21 C.F.R. § 101.9(c)(7)(i) & (iii). The unlawful front label protein claims induced consumers to purchase the Products at a premium price. Had Defendant complied with FDA regulations and not included a protein claim on the front label of its Products, reasonable consumers would not have purchased them or would have paid less for the Products.

20.     Defendant's failure to provide the required statement of the corrected amount of protein per serving, as well as Defendant's prominent front label protein claims made in the absence of any statement of the corrected amount of protein in the NFP, also deceived and misled reasonable consumers into believing that a serving of the Products will provide the grams of protein represented on the label, when that is not true. Had Defendant complied with the law, the statement of the corrected amount of protein would have revealed that the Products provide significantly less of the daily value of protein than high quality protein products with comparable protein quantities. The omission of this information allowed Defendant to charge a price premium. Had reasonable consumers been informed of the %DV for protein, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

**Consumer Demand for Protein**

21.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed,

1  the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the
2  consumption of protein.[1]

3      22.    Protein is found throughout the body—in muscle, bone, skin, hair, and virtually
4  every other body part or tissue. The health benefits of protein are well studied and wide
5  ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood
6  pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The
7  National Academy of Medicine recommends that adults get a minimum of .8 grams of protein
8  for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body
9  weight.[2] For a 140-pound person, that means about 50 grams of protein each day. For a 200-
10 pound person, that means about 70 grams of protein each day.

11     23.    The health benefits of protein are just as important, if not more important, for
12 children. Children are in a relative state of constant growth and rely on protein as the building
13 block of muscle, bone, skin, hair, and virtually every other body part or tissue. The National
14 Academies of Science recommends the following amounts of daily intake of protein based on
15 age group: 1-3 years old: 13g of protein per day; 4-8 years old: 19g of protein per day; 9-13
16 years old: 34g of protein per day.[3]

17     24.    Protein *quantity* by itself does not tell the full story of protein from a human
18 nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or
19 utilize some proteins. Proteins are not monolithic. They are simply chains of amino acids, and
20 different types of amino acids chained together in different ways will make different types of
21 proteins. Further, the makeup of the protein changes the function of that protein in the body,
22 and certain types of proteins are more easily digested and used by humans than others.

23     25.    All of a human's proteins are formed through the process of protein synthesis
24 within their own bodies. That is, although humans consume dietary proteins, they digest those

[1] FDA Protein Fact Sheet,
https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf
[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).*
[3] *Id.*

proteins, break them down into their constituent amino acids, and then use those amino acids as building blocks to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are called the "essential amino acids" and they must be supplied through the diet.

26.     All nine essential amino acids are necessary for protein synthesis to take place. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. As the FDA has explicitly recognized, "[b]ecause excess amino acids are not stored in the body, humans need a constant supply of good quality dietary proteins to support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

27.     A protein source's digestibility also affects the amount of useable protein a person receives from consuming it. Plant-based proteins like oats are approximately 80% digestible, meaning 20% of the protein from that source will simply pass through the body without ever being absorbed at all.

28.     As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS"), is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii).

29.    The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then combine that with the proteins' digestibility into an overall discount factor (i.e., a "score" from 0.0-1.0) that represents the actual amount of protein the food provides nutritionally when multiplied by raw protein quantity. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(i).

30.    Defendant uses plant-based proteins in its products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Although some plants can be high quality protein sources, most plant based proteins do not contain all nine essential amino acids and are low quality to humans. Almond, Peanut, and Oat proteins all have PDCAAS scores of between 4. & .5, meaning approximately 50-60% of the protein from those sources will be useless to humans nutritionally speaking.

31.    Accordingly, Defendant's use of low-quality proteins in the Products means that they actually provide far less protein to humans than the Product labels claim.

**Federal and State Regulations Governing Food Labeling**

32.    Identical federal and California laws regulate the content of labels on packaged food. The requirements of the Act, and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state.") The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, none of the California laws sought to be enforced here imposes different requirements on the labeling of packaged food for sale in the United States.

33.    The Act, 21 U.S.C. § 343(a), and the Sherman Law, provides that a food is misbranded if "its labeling is false or misleading in any particular."

**The Front Label Protein Claims Were Unlawful Due to the Omission of the %DV Inside the NFP as was the NFP Itself.**

34.   A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient." 21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel, about the level of a nutrient. 21 C.F.R. 101.13(b)(1). Moreover, stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim. 21 C.F.R. § 101.13(c).

35.   The FDA has always considered nutrient content claims to be "a marketing activity," the purpose of which is to advertise a specific product as a "significant source" of the relevant nutrient. 56 Fed. Reg. 60366, 60372, 60375. The FDA has long been suspicious of nutrient content claims and has repeatedly stated that such claims can be misleading, so the rules that govern them are far more restrictive. Indeed, "the general rule is that 'nutrient content claims' are not permitted on food labels" and must instead satisfy all of the requirements of § 101.13 before being authorized to appear at all.

36.   FDA regulations specifically condition the ability to make a nutrient content claim on compliance with the rules governing the NFP. Section 101.9(c)(7)(i), in particular, sets forth special rules for the NFP when manufacturers make a protein claim outside the NFP. It provides that "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . *shall* be given if a protein claim is made for the product . . ." 21 C.F.R. 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to perform PDCAAS and provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims.

37.   The regulation governing nutrient content claims, section 101.13, also makes this plain. Section 101.13(n) provides that "[n]utrition labeling in accordance with § 101.9 . . . shall be provided for any food for which a nutrient content claim is made" and § 101.13(b) states "a nutrient content claim[] may not be made on the label . . . unless the claim is made in accordance with this regulation [i.e., § 101.13] . . . ." In other words, a manufacturer may not

- 11 -

1    make any protein nutrient content claims on the front labels of their products unless they have

2    complied with the requirements for protein labeling in the nutrition facts panel pursuant to

3    section 101.9(c)(7). Indeed, the FDA made clear when promulgating § 101.13(n) that it means

4    that a manufacturer can only make "a nutrient content claim . . . on the label or in labeling of a

5    food, provided that the food bears nutrition labeling that complies with the requirements in

6    proposed § 101.9." 58 Fed. Reg. 2302, 23310.

7        38.    Further, FDA regulations require the %DV for protein to be calculated using

8    PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. §

9    101.9(c)(7)(i)-(iii); FDA Food Labeling Guide, p. 29, Question N.22.[4] The first step is to

10   calculate the "corrected amount of protein per serving" by multiplying protein quantity by the

11   PDCAAS quality value, and then dividing that "corrected amount" by 50 grams (the

12   "recommended daily value" for protein) to come up with the %DV. *Id.*

13       39.    The Products, currently or during the Class Period, all made protein claims on

14   the front label but failed to provide a statement of the corrected amount of protein per serving

15   in the NFP calculated according to the PDCAAS method. The protein claims on the front are,

16   therefore, unlawful, and were never permitted to be on the labels in the first instance under §§

17   101.9(c)(7)(i), 101.13(n), and 101.13(b).

18       40.    Defendant's failure to include a statement of the corrected amount of protein per

19   serving expressed as a %DV in the NFP also renders the NFP itself unlawful under

20   §§ 101.9(c)(7)(i)-(iii).

21       41.    Defendant's Products are, therefore, unlawful, misbranded, and violate the

22   Sherman Law, California Health & Safety Code § 110660, *et seq*. Defendant, currently and

23   during the Class Period, made protein content claims on the front of its Product packages even

24   though it uniformly failed to provide a statement of the corrected amount of protein per serving

25   in the NFP calculated according to the PDCAAS method and expressed as a %DV as required

26

27   ───────────────────────────────

     [4] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question

28   N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last
     accessed February 18, 2020).

by 21 C.F.R. § 101.9(c)(7)(i). Defendant's failure to comply with this requirement render these front label protein claims unlawful *per se* and the product misbranded pursuant to § 101.13(n) and (b), as well as under § 101.9(c)(7)(i) itself. Defendant's NFPs are also unlawful and in violation of § 101.9(c)(7)(i)-(iii).

**The Products' Labeling Violates Federal and State Regulations**

42.     Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

    a.  Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

    b.  Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear on food labeling is either missing or not sufficiently conspicuous);

    c.  Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

    d.  Section 110765, which makes it unlawful for any person to misbrand any food; and

    e.  Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

43.     Defendant's marketing, advertising, and sale of the Products also violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including, but not limited to:

    a.  Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

1        b.      Section 110395, which makes it unlawful to manufacture, sell, deliver,

2               hold or offer to sell any falsely or misleadingly advertised food; and

3        c.      Sections 110398 and 110400, which make it unlawful to advertise

4               misbranded food or to deliver or proffer for delivery any food that has

5               been falsely or misleadingly advertised.

6      44.    By failing to include on the Product labels the nutritional information required

7 by law, Defendant has violated the Act and the standards set by FDA regulations, including but

8 not limited to 21 C.F.R. § 101.9 (c)(7) and 21 C.F.R. §§ 101.13(i)(3), (b), (n), which have been

9 incorporated by reference into the Sherman Law.

10      45.    The aforementioned Sherman Law provisions stem from California's

11 traditional, historic police power to regulate food labels, which long predates the FDCA. *See*

12 *Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894) ("If there be any subject over which it

13 would seem the states ought to have plenary control, and the power to legislate in respect to

14 which . . . it is the protection of the people against fraud and deception in the sale of food

15 products"); *see also Brown v. Van's Int'l Foods, Inc*., No. 3:22-cv-00001-WHO, 2022 U.S.

16 Dist. LEXIS 84477, *19 (N.D. Cal. May 10, 2022) ("[s]tates have traditionally possessed the

17 power to protect their citizens from fraud and deception in the sale of food, and therefore there

18 is a strong presumption against federal preemption in the area of marketing food"),

19 quoting *Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 573 (N.D. Cal. 2013).

20      46.    Moreover, while the Sherman Law directly incorporates the FDA food labeling

21 regulations in Section 110665, Plaintiffs base their claims on other Sherman Law provisions

22 that independently prohibit the dissemination of "false or misleading food advertisements"

23 (which include food labels) and the misbranding of food, including Sections 110705, 110760,

24 110765, 110390, 11039, 110398.   These provisions, in particular, would exist even if the

25 FDCA did not.

26 **The Omission of the %DV Was Misleading Under Traditional State Law Prohibitions**
**Against Fraudulent and Deceptive Advertising.**

27

28

47.     In addition to violating the aforementioned statutes, Defendant has violated the traditional common law duty not to commit fraud and mislead consumers about the characteristics and qualities of its Products, as well as traditional state law prohibitions on false and misleading advertising that long predate the FDCA or Sherman Law.

48.     Defendant's use of a front-label protein claim, while failing to include the required statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV, is misleading. Reasonable consumers are unaware of the nutritional value of various protein sources and upon seeing a front-label quantitative protein claim reasonably believe that all of the advertised protein will be nutritionally available—i.e., that the product contains high quality proteins. Had Defendant complied with the law, the statement of the corrected amount of protein expressed as a %DV would have revealed that the Products provide significantly less of the daily value of protein than high quality protein products with comparable protein quantities. Had reasonable consumers been informed of the %DV for protein, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

49.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. They would not know the quality of protein in the Products or how much of the daily recommended value of protein they provide merely by looking elsewhere on the product package given Defendant's omissions. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain the nutritional value of the protein in the Products. The average reasonable consumer had no reason to suspect that Defendant's representations and omissions on the packages were misleading.

50.     Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with its protein claims.

51.     Defendant's duty not to mislead consumers about the quality or nutritional value of the protein in its products does not stem from either the FDCA or California's Sherman Law. Instead, that duty stems from traditional California prohibitions on misleading and deceptive advertising (including prohibitions on fraudulent omissions) that long predate the FDCA or Sherman Law, including the UCL's fraud prong, the CLRA, the FAL, and the common law tort of fraud.

**Defendant Misleadingly Markets the Products to Increase Profits and Gain a Competitive Edge**

52.     In making unlawful, false, misleading, and deceptive representations, Defendant distinguishes the Products from its competitors' products. Defendant knew and intended that consumers would purchase, and pay a premium for, products labeled with protein claims and that failed to reveal they provide less of the daily value of protein than comparable products with high quality proteins. By using this branding and marketing strategy, Defendant is stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make protein claims, or that do not make protein claims based on poorly-disclosed added ingredients, or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV and otherwise do not mislead consumers about the quality or nutritional value of the protein in their products.

**Defendant Intends to Continue to Market the Products with Protein Claims**

53.     Because consumers pay a price premium for products that make protein claims, and also pay a premium for products that provide more protein, by labeling its Products with protein claims and/or omitting the required statement of the corrected amount of protein per serving, Defendant is able to both increase its sales and retain more profits.

54.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in its products, and/or (ii)

commanding a higher price for its Products because consumers will pay more for the Products due to consumers' demand for products with protein claims.

55.     The market for protein products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the number of grams of protein in food products, Defendant has an incentive to continue to make such unlawful and misleading representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

56.     For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[5]

57.     To capitalize on the growing market, Defendant continues to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. Moreover, Defendant has continued to replicate its misrepresentations on new products. It is therefore likely that Defendant will continue to unlawfully and/or misleadingly advertise the Products and perpetuate the misrepresentations regarding the protein in the Products.

**PLAINTIFF'S EXPERIENCES**

58.     On multiple occasions in the last three years, Plaintiff purchased KIND Dark Chocolate Nuts & Sea Salt and Peanut Butter Dark Chocolate nut bars from Lucky Supermarket in Alameda County, California on multiple occasions.

59.     Plaintiff made each of his purchases after reading and relying on the truthfulness of Defendant's front labels that promised the Products provided a specific number of grams of protein per serving. For example, he purchased the KIND Dark Chocolate Nuts & Sea Salt nut bar relying on the representation of "6g PROTEIN" on the front label. He believed the truth of each representation, i.e., that the product would actually provide the full amount of protein claimed on the front labels in a form human bodies could utilize. He relied on the Products to meet his protein dietary needs. Had Defendant complied with the law and not made the protein claims on the front of its packages, he would not have been drawn to the Products

---

[5] https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright

1    and would not have purchased them. At a minimum, Plaintiff would have paid less for each

2    Product.

3         60.     Moreover, had Defendant adequately disclosed the corrected amount of protein

4    per serving for each Product expressed as a %DV, as FDA regulations require, Plaintiff would

5    not have purchased the Products or would have, at minimum, paid less for them. Plaintiff

6    regularly checks the NFP before purchasing any product for the first time, including the %DV

7    column for protein when manufacturers provide it, and he uses that information as a basis of

8    comparison between similar products. He looked at and read the NFP on the KIND Dark

9    Chocolate Nuts & Sea Salt and Peanut Butter Dark Chocolate bars before purchasing them for

10   the first time. Manufacturers do not always disclose a %DV for protein, but when they do, he

11   prefers products that provide more of the recommend daily amount of protein (i.e., the one

12   with a higher %DV). When a manufacturer does not provide a %DV for protein, he can only

13   go off of the stated grams of protein, and he assumes that all of those disclosed grams are in a

14   form his body can use as protein.

15        61.     For example, with the KIND Dark Chocolate Nuts & Sea Salt bars, Plaintiff was

16   looking for a product that would provide 6 grams of useable, i.e., high quality, protein per

17   serving. Had Defendant disclosed that the product provided nutritionally only 6% of the daily

18   value of protein, Plaintiff would have used that information as a basis to compare similar

19   products and would have preferred, instead, to purchase a different product with a higher %DV.

20   At a minimum he would have paid less for Defendant's product. Without the statement of the

21   corrected amount of protein per serving in the form of a %DV, the only information Plaintiff

22   had about the Products was the 6 gram protein quantity, and he did in fact believe he was

23   receiving 6 grams of high-quality protein when he purchased the Products.

24        62.     Plaintiff continues to desire to purchase protein products, including those

25   marketed and sold by Defendant, and would like to purchase products that provide 6 grams of

26   protein per serving. If the Products that currently make unlawful protein claims are

27   reformulated to ensure they provide, in a usable form, the grams of protein that are represented

28   on the labels, or their labels are changed to provide non-misleading information, Plaintiff

would likely purchase those Products again in the future but will not do so until then. Plaintiff regularly visits stores where the Products and other protein products are sold. Because Plaintiff does not know the formula for Defendant's products, which can change over time, and cannot test whether the Products provide the amount of digestible protein that is represented on the label without first purchasing the Product, Plaintiff will be unable to rely on Defendant's labels when shopping for protein products in the future absent an injunction that prohibits Defendant from mislabeling its Products. Plaintiff would also be forced to retest and/or reanalyze each Product that makes a protein claim but fails to include the %DV at each time of purchase because such Products' ingredient list and labeling would not reveal any changes in the amount of digestible protein, even if such changes took place. In addition, at present Plaintiff cannot rely on the accuracy of Defendant's labels for the entire line of Products, which Plaintiff is also interested in purchasing with labeling that comports with regulations. Should Defendant begin to market and sell a new line of products, Plaintiff could also be at risk for buying another one of Defendant's products in reliance on the same or similar misrepresentation and omissions. And because of Defendant's unlawful and misleading labels on its Products, Plaintiff cannot make informed choices between protein products offered by Defendant and protein products offered by other manufacturers, such as choices based on price and relative nutritional content.

63.    Plaintiff and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under state law and the products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

## CLASS ALLEGATIONS

64.    Plaintiff brings this class action lawsuit on behalf of himself and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

**The California Class:** All persons in the State of California who purchased the Products between June 11, 2017 and the present.

65. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

66. Numerosity: Plaintiff does not know the exact size the Class, but he estimates that they are each composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

67. Common Questions Predominate: This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions on Defendant's Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Classes are:

a. What is the PDCAAS for the protein in the Products;

b. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are unlawful and/or misleading;

c. Whether Defendant's actions violate Federal and California laws invoked herein;

d. Whether labeling the Products with a protein claim causes the Products to command a price premium in the market;

e. Whether Defendant's failure to provide a statement of the corrected amount of protein per serving in the Products sold to the Classes was likely to deceive reasonable consumers;

f. Whether representations regarding the number of grams of protein in the Products are material to a reasonable consumer;

g.      Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

h.      The amount of profits and revenues Defendant earned as a result of the conduct;

i.      Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j.      Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

68.     Typicality: Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Classes were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

69.     Adequacy of Representation: Plaintiff will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and that of the Classes. By prevailing on his own claims, Plaintiff will establish Defendant's liability to all Class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

70.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the

class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

71.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFF'S FIRST CAUSE OF ACTION
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)**
**On Behalf of Plaintiff and the California Class**

72.    Plaintiff realleges and incorporates the paragraphs of this Class Action Complaint as if set forth herein.

73.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

74.    Plaintiff and other California Class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

75.     The Products that Plaintiff (and other similarly situated class members) purchased from Defendant were "goods" within the meaning of California Civil Code § 1761(a).

76.     Defendant's acts, practices, and omissions, set forth in this Class Action Complaint, led customers to falsely believe that the Products contained high quality proteins that provided nutritionally the full amount of protein advertised on the product package. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods it sells have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code § 1770(a)(7), Defendant's acts, practices, and omissions constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendant deceptively markets and advertises that, unlike other protein product manufacturers, it sells Products that provide nutritionally more grams of protein than the Products actually do. In violation of California Civil Code §1770(a)(9), Defendant has advertised goods or services with intent not to sell them as advertised.

77.     Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the Class will continue to suffer harm. Plaintiff and those similarly situated have no adequate remedy at law to stop Defendant's continuing practices.

78.     Defendant was provided with notice and a demand to correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein

1    over 30 days before this suit was filed. Despite receiving the aforementioned notice and

2    demand, Defendant failed to do so in that, among other things, it failed to identify consumers,

3    notify them of their right to correction, repair, replacement or other remedy, and/or to provide

4    that remedy. Accordingly, Plaintiff seeks, pursuant to California Civil Code § 1780(a)(3), on

5    behalf of himself and those similarly situated class members, compensatory damages, punitive

6    damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

7         79.    Plaintiff also requests that this Court award his costs and reasonable attorneys'

8    fees pursuant to California Civil Code § 1780(d).

9                        **PLAINTIFF'S SECOND CAUSE OF ACTION**
                **(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
10                          **On Behalf of Plaintiff and the California Class**

11        80.    Plaintiff realleges and incorporates by reference the paragraphs of this Class

12   Action Complaint as if set forth herein.

13        81.    Beginning at an exact date unknown to Plaintiff, but within four (4) years

14   preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive

15   and/or misleading statements in connection with the advertising and marketing of the Products.

16        82.    Defendant made representations and statements (by omission and commission)

17   that led reasonable customers to believe that the Products that they were purchasing contained

18   high quality proteins that provided nutritionally more grams of protein per serving than the

19   Products actually provided, and that the Products were appropriate for meeting protein dietary

20   needs. Defendant had a duty to disclose the corrected amount of protein per serving in the

21   NFP, as calculated according to the PDCAAS method, which Defendant failed to do.

22        83.    Plaintiff and those similarly situated relied to their detriment on Defendant's

23   false, misleading and deceptive advertising and marketing practices, including each of the

24   misrepresentations and omissions set forth above. Had Plaintiff and those similarly situated

25   been adequately informed and not intentionally deceived by Defendant, they would have acted

26   differently by, without limitation, refraining from purchasing Defendant's Products or paying

27   less for them.

28        84.    Defendant's acts and omissions are likely to deceive the general public.

85.     Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

86.     The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

87.     As a direct and proximate result of such actions, Plaintiff and the other members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

88.     Plaintiff seeks, on behalf of himself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in his other causes of action, in the event that such causes of action will not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent Class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will

lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

89.    Plaintiff seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

90.    Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiff, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PLAINTIFF'S THIRD CAUSE OF ACTION
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Plaintiff and the California Class**

91.    Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

92.    Defendant has fraudulently and deceptively informed Plaintiff that the Products provide more grams of protein than they actually provide in a form useful to the human body. Defendant failed to provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method, on all the Products, as it was required to do.

93.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiff, and material at the time they were made. Defendant knew or should have known the composition of the Products, and

1  knew or should have known that the Products did not contain or provide the amount of protein

2  represented on the label. Defendant's misrepresentations and omissions concerned material

3  facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase

4  Defendant's Products. In misleading Plaintiff and not so informing Plaintiff, Defendant

5  breached its duty to them. Defendant also gained financially from, and as a result of, its breach.

6         94.    Plaintiff and those similarly situated relied to their detriment on Defendant's

7  misrepresentations and fraudulent omissions. Had Plaintiff and those similarly situated been

8  adequately informed and not intentionally deceived by Defendant, they would have acted

9  differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of

10 them, or (iii) paying less for the Products.

11        95.    By and through such fraud, deceit, misrepresentations and/or omissions,

12 Defendant intended to induce Plaintiff and those similarly situated to alter their position to

13 their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff and

14 those similarly situated to, without limitation, purchase the Products.

15        96.    Plaintiff and those similarly situated justifiably and reasonably relied on

16 Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant.

17        97.    As a direct and proximate result of Defendant's misrepresentations and/or

18 omissions, Plaintiff and those similarly situated have suffered damages, including, without

19 limitation, the amount they paid for the Products.

20        98.    Defendant's conduct as described herein was wilful and malicious and was

21 designed to maximize Defendant's profits even though Defendant knew that it would cause

22 loss and harm to Plaintiff and those similarly situated.

### PLAINTIFF'S FOURTH CAUSE OF ACTION
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Plaintiff and the California Class**

26        99.    Plaintiff realleges and incorporates by reference the paragraphs of this Class

27 Action Complaint as if set forth herein.

100.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

101.    In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. 21 C.F.R. § 101.9 (c)(7), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

102.    In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) unlawfully making a protein claim on the front of the package without complying with the regulatory requirements for making a protein claim set forth in 21 C.F.R. § 101.9(c)(7)(i)-(iii) and incorporated by reference by California's Sherman law; (ii) failing to provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method and expressed as a %DV, as required by FDA regulations; and (iii) misleading reasonable consumers regarding the quality of protein in their products and its contribution to consumers' daily protein needs by omitting the %DV for protein.

103.    Plaintiff and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

1    104.    Defendant's acts and omissions are likely to deceive the general public.

2    105.    Defendant engaged in these deceptive and unlawful practices to increase its

3    profits. Accordingly, Defendant has engaged in unlawful and fraudulent trade practices, as

4    defined and prohibited by section 17200, *et seq.* of the California Business and Professions

5    Code.

6    106.    The aforementioned practices, which Defendant has used to its significant

7    financial gain, also constitute unlawful competition and provide an unlawful advantage over

8    Defendant's competitors as well as injury to the general public.

9    107.    As a direct and proximate result of such actions, Plaintiff and the other Class

10   members have suffered and continue to suffer injury in fact and have lost money and/or

11   property as a result of such deceptive and/or unlawful trade practices and unfair competition in

12   an amount which will be proven at trial, but which is in excess of the jurisdictional minimum

13   of this Court. Among other things, Plaintiff and the Class members lost the amount they paid

14   for the Products.

15   108.    As a direct and proximate result of such actions, Defendant has enjoyed, and

16   continues to enjoy, significant financial gain in an amount which will be proven at trial, but

17   which is in excess of the jurisdictional minimum of this Court.

18   109.    Plaintiff seeks, on behalf of himself and those similarly situated, equitable

19   relief, including the restitution for the premium and/or full price that they or others paid to

20   Defendant as a result of Defendant's conduct. Plaintiff and the Class lack an adequate remedy

21   at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of

22   action because the California Sherman Law does not provide a direct cause of action, so

23   Plaintiff and the Class must allege those violations as predicate acts under the UCL to obtain

24   relief.

25   110.    Plaintiff also seeks equitable relief, including restitution, with respect to his

26   UCL "fraudulent" prong claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff

27   makes the following allegations in this paragraph only hypothetically and as an alternative to

28   any contrary allegations in their other causes of action, in the event that such causes of action

do not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

111.   Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

112.   Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiff and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PLAINTIFF'S FIFTH CAUSE OF ACTION
### (Unjust Enrichment)
### On Behalf of Plaintiff and the California Class

113.   Plaintiff realleges and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

114.   Plaintiff and members of the Class conferred a benefit on the Defendant by purchasing the Products.

115.   Defendant has been unjustly enriched in retaining the revenues from Plaintiff's and Class members' purchases of the Products, which retention is unjust and inequitable, because Defendant falsely represented that the Products contained specific amounts of protein per serving, while failing to disclose that true daily value of the Protein the products actually provide.

116.   Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for its unjust enrichment, as ordered by the Court. Plaintiff and those similarly situated have no adequate remedy at law to obtain this restitution.

117.   Plaintiff, therefore, seeks an order requiring Defendant to make restitution to them and other members of the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and those similarly situated, respectfully request that the Court enter judgement against Defendant as follows:

A.   Certification of the proposed Classes, including appointment of Plaintiff's counsel as class counsel;

B.   An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.   An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.   An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.   An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

1       F.     An award of treble damages, except for those causes of action where treble

2  damages are not legally available;

3       G.     An award of restitution in an amount to be determined at trial;

4       H.     An order requiring Defendant to pay both pre- and post-judgment interest on

5  any amounts awarded;

6       I.     For reasonable attorneys' fees and the costs of suit incurred; and

7       J.     For such further relief as this Court may deem just and proper.

8  **<u>JURY TRIAL DEMANDED</u>**

9  Plaintiff hereby demands a trial by jury.

10  Dated: October 28, 2022

                                 **GUTRIDE SAFIER LLP**

                                 */s/Seth A. Safier/s/*

                                 Seth A. Safier (State Bar No. 197427)
                                  seth@gutridesafier.com
                                 Marie A. McCrary (State Bar No. 262670)
                                  marie@gutridesafier.com
                                 Hayley Reynolds (State Bar No. 306427)
                                  hayley@gutridesafier.com
                                 100 Pine Street, Suite 1250
                                 San Francisco, California 94111
                                 Telephone: (415) 639-9090
                                 Facsimile:  (415) 449-6469

                                 *Attorneys for Plaintiff*

## EXHIBIT A

I, Chris Guerra, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.      As set forth in my complaint, I purchased KIND Dark Chocolate Nuts & Sea Salt and Peanut Butter Dark Chocolate nut bars from Lucky Supermarket in Alameda County, California on multiple occasions during the last three years.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed October 26, 2022, in San Leandro, California.

DocuSigned by:

*Chris Guerra*

1836F3454393435...

Chris Guerra

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

**Exhibit B**

| Product Type | Variety | Protein Claims |
|---|---|---|
| **Nut Clusters** | | |
| Nut Clusters | Dark Chocolate Nuts & Sea Salt | 4g plant protein |
| Nut Clusters | Peanut Butter Dark Chocolate | 4g plant protein |
| **Nut Bars** | | |
| Nut Bars | Dark Chocolate Nut and Sea Salt | 6g |
| Nut Bars | Caramel Almond & Sea Salt | 6g |
| Nut Bars | Milk Chocolate Almond | 6g |
| Nut Bars | Milk Chocolate Peanut Butter | 7g |
| Nut Bars | Extra Dark Chocolate Nuts & Sea Salt | 6g |
| Nut Bars | Peanut Butter Dark Chocolate | 7g |
| Nut Bars | Dark Chocolate Cherry Cashew | 4g |
| Nut Bars | Cranberry Almond | 5g |
| Nut Bars | Dark Chocolate Mocha Almond | 5g |
| Nut Bars | Blueberry Vanilla Cashew | 5g |
| Nut Bars | Peanut Butter | 6g |
| Nut Bars | Madagascar Vanilla Almond | 6g |
| Nut Bars | Salted Caramel Dark Chocolate Nut | 5g |
| Nut Bars | Pomegranate Blueberry Pistachio | 5g |
| Nut Bars | Dark Chocolate Cinnamon Pecan | 5g |
| Nut Bars | Raspberry Cashew Chia | 5g |
| Nut Bars | Dark Chocolate Almond Mint | 5g |
| Nut Bars | Maple Glazed Pecan and Sea Salt | 5g |
| Nut Bars | Blueberry Almond Pecan | 4g |
| Nut Bars | Fruit and Nut | 6g |
| Nut Bars | Honey Roasted Nuts and Sea Salt | 6g |
| **Protein Bars** | | |
| Protein Bars | Almond Butter Dark Chocolate | 12g plant protein |
| Protein Bars | Caramel Nut | 12g plant protein |

| Product Type | Variety | Protein Claims |
|---|---|---|
| **Energy Bars** | | |
| Energy Bars | Chocolate Chunk | 10g |
| Energy Bars | Dark Chocolate Peanut Butter | 10g |
| Energy Bars | Peanut Butter | 10g |
| **Healthy Grains Granola** | | |
| Healthy Grains Granola | Peanut Butter Clusters | 10g |
| Healthy Grains Granola | Dark Chocolate Clusters | 10g |
| Healthy Grains Granola | Almond Butter Clusters | 10g |
| **Clusters** | | |
| Clusters | Almond Cashew Sunflower with Sunflower & Pumpkin Seeds | 5g plant protein |
| Clusters | Almond Pumpkin Chia Clusters with Pumpkin, Sunflower, Hemp & Chia Seeds | 6g plant protein |
| **Snack Mix** | | |
| Snack Mix | Dark Chocolate Peanut Butter Banana | 5g |
| Snack Mix | Dark Chocolate Nuts and Sea Salt | 5g |
| Snack Mix | Dark Chocolate Cherry Cashew | 4g |
| **Oatmeal** | | |
| Oatmeal | Dark Chocolate Almond | 5g |
| Oatmeal | Apple Cinnamon Almond | 5g |
| Oatmeal | Oats and Almond | 5g |
| Oatmeal | Cranberry Almond | 5g |
| **Protein Cereal** | | |
| Protein Cereal | Dark Chocolate Almond | 6g |
| Protein Cereal | Honey Almond | 6g |
| Protein Cereal | Cranberry Almond | 6g |
| Protein Cereal | Apple Cinnamon | 5g |
| **Nut Butter Bars** | | |
| Nut Butter Bars | Peanut Butter Dark Chocolate | 13g |
| Nut Butter Bars | Almond Butter Blueberry | 12g |
| Nut Butter Bars | Peanut Butter Crunch | 14g |

| Product Type | Variety | Protein Claims |
|---|---|---|
| Nut Butter Bars | Almond Butter Dark Chocolate | 12g |